STATE OF CONNECTICUT *v.* CHARLES HARRIS, JR.
(AC 17046)

O'Connell, C. J., and Schaller and Hennessy, Js.

[10] See footnotes 6 and 7.

Argued January 12—officially released June 23, 1998

*Avery S. Chapman*, for the appellant (defendant).

*John A. East III*, assistant state's attorney, with whom, on the brief, were *Mary M. Galvin*, state's attorney, *Gerard F. Esposito*, senior assistant state's attorney, and *Holly A. Trexler*, legal intern, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of aiding and abetting manslaughter in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-55 (a) (1). On appeal, the defendant claims that the trial court improperly (1) instructed the jury on the charge of aiding and abetting manslaughter, (2) denied the defendant's motion for acquittal and motion in arrest of judgment, (3) excluded evidence that would have impeached the credibility of a state's witness and (4) denied the defendant's motion to dismiss for failure to comply with the speedy trial provision of the interstate agreement on detainers. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant was a leader of a gang that engaged in illegal drug trafficking in a public housing project on Olson Drive in Ansonia. The victim, Timothy Hopkins, began selling drugs in this housing project in June, 1994, in direct competition with the defendant's gang. The defendant decided to scare the victim away from his territory by having a fellow gang member shoot the victim in the buttocks. On June 28, 1994, the defendant ordered one gang member, Damon Spencer, to carry out the threat and handed him a .357 magnum pistol. Spencer refused to comply with the defendant's order because criminal charges were already pending against him in another matter. The defendant then ordered another gang member, Terron Lopes, to carry out the threat and handed him the same gun. Lopes was hesitant to comply with the order, but eventually relented after he was threatened and coerced by the defendant.

The defendant, Spencer and Lopes then went looking for the victim in the housing project. When they located the victim in the stairwell of one of the buildings, the

defendant encouraged Lopes to shoot the victim. After Lopes shot the victim twice, the defendant ordered Lopes to discard the gun and flee from the scene. Later, the defendant assisted Lopes in washing gunpowder residue from his hands in a nearby apartment. The defendant also congratulated Lopes and gave him approximately $100 as a reward.

The victim was still alive when he was transported by emergency medical personnel to nearby Griffin Hospital, where he was later pronounced dead. An autopsy revealed that the victim was shot by two bullets, which caused five separate wounds. The fatal bullet perforated a number of major blood vessels in the lower abdominal and upper leg areas, that resulted in massive blood loss, which caused the victim's death. This bullet was later retrieved from the victim's body, and ballistic tests revealed that it was fired from the same .357 magnum pistol that was recovered by police in the housing project. The gun contained the fingerprints of both Lopes and Spencer.

On the day following the shooting, the police questioned Lopes about the incident and showed him the gun. Lopes denied any knowledge of either the incident or the gun. After the defendant became a suspect in the incident, he began to pressure Lopes into accepting full responsibility for the shooting. On July 1, 1994, Lopes surrendered to the police and took sole responsibility for the shooting. Lopes was then charged with murder. On April 6, 1995, Lopes gave a statement to an inspector from the office of the state's attorney that inculpated the defendant in the shooting. Lopes stated that the defendant had coerced him into shooting the victim and taking sole responsibility for the shooting. Lopes also stated that he feared for both his safety and that of his family if he were to testify against the defendant. On June 6, 1995, Lopes pleaded guilty to a charge of manslaughter in the first degree. On August

11, 1995, Lopes was sentenced to a term of imprisonment of nineteen years.

On June 29, 1994, the police arrested Spencer in connection with the shooting. Spencer gave a statement when he was arrested that inculpated the defendant as the person who solicited both Lopes and him to shoot the victim. On July 8, 1994, Spencer gave the police another statement in which he again inculpated the defendant as the mastermind behind the shooting. In his second statement, Spencer stated that both he and Lopes feared the defendant, and that this fear caused Lopes to protect the defendant in his dealings with the police. On December 11, 1995, Spencer pleaded guilty to the charges of assault in the first degree as an accessory, conspiracy to commit assault in the first degree, tampering with evidence and failure to appear. On January 26, 1996, he was sentenced to a term of imprisonment of ten years.

The defendant was charged on May 10, 1996, with conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a (a), and murder as an accessory in violation of General Statutes §§ 53a-8 (a) and 53a-54a (a). After an eight day jury trial, the defendant was found not guilty of conspiracy to commit murder and murder as an accessory, but was found guilty of the lesser included offense of manslaughter in the first degree as an accessory in violation of §§ 53a-8 and 53a-55 (a) (1).

I

The defendant first claims that the trial court improperly instructed the jury on the charge of aiding and abetting manslaughter. In support of this claim, he makes two assertions. First, he claims that there is no such crime in Connecticut as being an accessory to manslaughter and that it was improper to instruct the jury accordingly. Second, he claims that because the

amended information by which he was charged did not contain the charge of aiding and abetting manslaughter, he did not receive proper notice of the charges he was facing in violation of his rights to due process of law and to a fair trial. We are not persuaded by either claim.

A

The defendant claims that the crime of aiding and abetting manslaughter in the first degree does not exist in Connecticut because a person cannot aid and abet unintentional conduct. In support of this position, the defendant asserts that manslaughter in the first degree is an unintentional killing. This claim is without merit.

As a preliminary note, the defendant was convicted of violating §§ 53a-8[1] and 53a-55 (a) (1).[2] Our Supreme Court has repeatedly held that a conviction under § 53a-8 requires proof of a dual intent, i.e., "that the accessory have the intent to *aid* the principal *and* that in so aiding he intend to *commit* the offense with which he is charged." (Emphasis in original.) *State* v. *Harrison*, 178 Conn. 689, 694, 425 A.2d 111 (1979); see *State* v. *Foster*, 202 Conn. 520, 525–26, 522 A.2d 277 (1987); *State* v. *Crump*, 201 Conn. 489, 495, 518 A.2d 378 (1986); *State* v. *Fleming*, 198 Conn. 255, 271, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986); *State* v. *Nardini*, 187 Conn. 513, 531, 447 A.2d 396 (1982).

It should be noted that § 53a-8 does not provide for a separate, substantive offense for being an accessory,

---

[1] General Statutes § 53a-8 (a) provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

[2] General Statutes § 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ."

but rather the statute provides an alternate means by which the underlying substantive crime may be committed. *State* v. *Edwards*, 201 Conn. 125, 130–31, 513 A.2d 669 (1986); *State* v. *Harris*, 198 Conn. 158, 163, 502 A.2d 880 (1985); *State* v. *Baker*, 195 Conn. 598, 608, 489 A.2d 1041 (1985). Thus, a defendant may be convicted of manslaughter in the first degree on the basis of his status as an accessory to the crime.

To support his claim that the crime of being an accessory to manslaughter in the first degree is not a cognizable crime in Connecticut, the defendant points to the dual intent requirement of § 53a-8 and cites cases that support the proposition that it is a logical impossibility either to conspire or to attempt to achieve an unintentional or reckless result. See *State* v. *Beccia*, 199 Conn. 1, 4, 505 A.2d 683 (1986) (conspiracy to commit arson in third degree not cognizable because arson requires reckless mental state); *State* v. *Almeda*, 189 Conn. 303, 309, 455 A.2d 1326 (1983) (attempted manslaughter not cognizable because not possible to have specific intent to commit unintentional killing). The defendant's reliance on these cases is misplaced.

The specific claim that the defendant raises here has been previously addressed and refuted by our Supreme Court in *State* v. *Foster*, supra, 202 Conn. 533. The *Foster* court specifically addressed the arguments based on the *Beccia* and *Almeda* decisions, and concluded that accessorial liability is distinguishable from both conspiracy and attempt liability. The court held that accessorial liability is cognizable for criminally negligent homicide, provided the defendant possesses "the requisite culpable mental state for the commission of the substantive offense, and he intentionally aids another in the crime." Id. "If a person, in intentionally aiding another, acts with the mental culpability required for

the commission of a crime—be it 'intentional' or 'criminally negligent'—he is liable for the commission of that crime." Id., 532.

Thus, because the defendant in this case was charged under § 53a-55 (a) (1), which requires the intent to cause serious physical injury that results in the victim's death, the only requirement to being found guilty of manslaughter in the first degree as an accessory is that the defendant must intend both to assist the shooter and to cause serious physical injury to the victim. Accordingly, the defendant's claim that he cannot be found guilty of being an accessory to manslaughter because he did not intend to kill the victim and because the victim's death was an unintentional result is without merit. The only intent necessary under § 53a-55 (a) (1) is the intent to cause serious physical injury. As will be discussed in part II of this opinion, there was sufficient evidence presented at trial to allow the jury to conclude that the defendant intended to cause serious physical injury to the victim. It is irrelevant under § 53a-55 (a) (1) that the victim's death was an unintentional result.

In addition, we note that this is not the first case in which a defendant has been charged as an accessory to manslaughter in the first degree. The defendants in the following cases were all found guilty of manslaughter in the first degree on the basis of their being accessories under §§ 53a-8 and 53a-55: *State* v. *Dyson*, 217 Conn. 498, 586 A.2d 610 (1991); *State* v. *Faulkner*, 48 Conn. App. 275, 709 A.2d 36 (1998); *State* v. *Billie*, 47 Conn. App. 678, 707 A.2d 324, cert. granted, 244 Conn. 933, 717 A.2d 231 (1998); *State* v. *Huckabee*, 41 Conn. App. 565, 677 A.2d 452, cert. denied, 239 Conn. 903, 682 A.2d 1009 (1996); *State* v. *Bagley*, 35 Conn. App. 138, 644 A.2d 386, cert. denied, 231 Conn. 913, 648 A.2d 157 (1994); *State* v. *Gamble*, 27 Conn. App. 1, 604 A.2d 366, cert. denied, 222 Conn. 901, 606 A.2d 1329 (1992); *State* v. *Spears*, 20 Conn. App. 410, 567 A.2d 1245 (1989).

These cases support the basic proposition that criminal liability as an accessory to manslaughter in the first degree is not a novel charge and, in fact, has long been recognized under Connecticut jurisprudence. As a result, the defendant's claim that this specific crime is not cognizable in Connecticut must fail.

B

The defendant also contends that it was improper for the trial court to instruct the jury on the crime of manslaughter in the first degree as an accessory because this charge was not contained in the information and, as a result, he was not properly notified of the charges against him in violation of his constitutional rights to due process and to a fair trial.

The defendant was charged in the information with conspiracy to commit murder and murder as an accessory. The state requested a jury instruction on the lesser included offense of manslaughter in the first degree as an accessory. The defendant objected, but the trial court decided that it would instruct the jury on this lesser included offense. The jury found the defendant not guilty of the conspiracy to commit murder and murder as an accessory charges, but found the defendant guilty of the lesser included offense of manslaughter as an accessory.

As a general matter, "[i]t is a well-settled principle of constitutional law that where one or more offenses are lesser than and included within the one charged, notice of the one charged constitutes notice of any lesser included offenses." *State* v. *Rodriguez*, 180 Conn. 382, 402, 429 A.2d 919 (1980).

In addition, our Supreme Court has specifically held in several cases that a defendant may be found guilty as an accessory pursuant to § 53a-8, despite the failure

to be so charged in the information. See *State v. Williams*, 220 Conn. 385, 388–90, 599 A.2d 1053 (1991); *State* v. *Crump*, supra, 201 Conn. 493; *State* v. *Johns*, 184 Conn. 369, 373–74 n.7, 439 A.2d 1049 (1981); *State* v. *Ferrara*, 176 Conn. 508, 513 n.2, 408 A.2d 265 (1979); *State* v. *Ives*, 172 Conn. 322, 323, 374 A.2d 244 (1977).

The defendant claims that in formulating his defense, he relied on *Beccia* and *Almeda*, and therefore believed it a logical impossibility to be charged as an accessory to manslaughter in the first degree. We addressed the inapplicability of those cases to the defendant's situation in part I A, and, therefore, this assertion is without merit.

The defendant further argues that he could not have been charged as an accessory to manslaughter because under *State* v. *Whistnant*, 179 Conn. 576, 588, 427 A.2d 414 (1980), it was not possible to commit the greater offense in the manner described in the information without having first committed the lesser offense. In support of this argument, the defendant claims that there was insufficient evidence presented to support his conviction as an accessory to manslaughter in the first degree because he did not intend to kill the victim, but sought only to inflict harm upon him. As we stated previously, the requisite intent under § 53a-55 (a) (1) is the intent to cause serious physical injury. The defendant's assertion, therefore, that he did not intend to kill the victim is irrelevant because the state did not have to prove intent to kill. For these reasons, we conclude that the defendant's constitutional rights to due process and to a fair trial were not violated.

II

The defendant next claims that there was insufficient evidence presented at trial to convict him of manslaughter as an accessory and, therefore, the trial court

improperly denied his motion for judgment of acquittal and motion in arrest of judgment. We disagree.

" 'When reviewing a sufficiency of the evidence claim, we first examine the evidence in the light most favorable to upholding the jury's verdict. *State* v. *Avis*, 209 Conn. 290, 309, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989); *State* v. *Rice*, 25 Conn. App. 646, 650, 595 A.2d 947 (1991). We then determine on the basis of the facts established and the inferences that reasonably could be drawn from those facts whether the jury reasonably could have concluded that the cumulative effect of the evidence established the defendant's guilt beyond a reasonable doubt. *State* v. *Famiglietti*, 219 Conn. 605, 609, 595 A.2d 306 (1991); *State* v. *Hopes*, 26 Conn. App. 367, 376, 602 A.2d 23, cert. denied, 221 Conn. 915, 603 A.2d 405 (1992). We note that the probative force of the evidence is not diminished because it consists, in whole or in part, of circumstantial evidence rather than direct evidence. *State* v. *Robinson*, 213 Conn. 243, 254, 567 A.2d 1173 (1989).' *State* v. *Lago*, 28 Conn. App. 9, 30, 611 A.2d 866, cert. denied, 223 Conn. 919, 614 A.2d 828 (1992). Our inquiry into whether the evidence in the record would support a finding of guilt beyond a reasonable doubt does not require us to ask if we believe that the evidence established guilt beyond a reasonable doubt, but rather if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' . . . *State* v. *Boykin*, 27 Conn. App. 558, 563–64, 609 A.2d 242, cert. denied, 223 Conn. 905, 610 A.2d 179 (1992). Once a defendant has been found guilty of the crime charged, we conduct our judicial review of all of the evidence in the light most favorable to the prosecution. Id., 564." (Emphasis in original.) *State* v. *Hamilton*, 30 Conn. App. 68, 71–72, 618 A.2d 1372 (1993), aff'd, 228 Conn. 234, 636 A.2d 760 (1994).

The following evidence presented at trial supports the jury's verdict. The defendant was a leader of a gang that engaged in narcotics trafficking in an Ansonia public housing project. The victim had begun selling narcotics in direct competition with the defendant's gang shortly before his death. The defendant had conferred with other gang members about the victim's presence, and they had decided that it was necessary to scare him away from their territory. The defendant commanded one gang member, Spencer, to shoot the victim in the buttocks. When Spencer refused to follow this order, the defendant ordered another gang member, Lopes, to do the shooting. The defendant handed the gun that killed the victim to Lopes and assisted Lopes in locating the victim within the Ansonia housing project. The defendant was present at the scene of the shooting, and afterward ordered Lopes to discard the gun and flee from the scene. The defendant assisted Lopes in washing gunpowder residue from his hands after the shooting. The defendant congratulated Lopes after completing the shooting and rewarded him with approximately $100. During the police investigation of the shooting, the defendant pressured both Spencer and Lopes into accepting full responsibility for the shooting, and to exculpate the defendant. On the basis of the foregoing facts, we conclude that there was sufficient evidence presented from which the jury could conclude that the defendant was guilty as an accessory to committing manslaughter in the first degree.

The defendant also claims that there was insufficient evidence to prove his guilt of manslaughter in the first degree because the state failed to prove that he intended to kill the victim. We have already stated that the state was not required to prove intent to kill under § 53a-55 (a) (1), but rather, only the intent to cause serious physical injury. The jury reasonably could have inferred that the defendant intended to cause serious physical

injury to the victim because evidence was presented that he wanted to scare the victim off of his drug territory by shooting him in the buttocks. "Serious physical injury" has been defined to include injury that "creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of a bodily organ." (Internal quotation marks omitted.) *State* v. *Allen*, 28 Conn. App. 81, 89, 611 A.2d 886, cert. denied, 223 Conn. 920, 614 A.2d 826 (1992). There can be no dispute that shooting someone in the buttocks with a .357 magnum pistol easily satisfies the definition of "serious physical injury." Therefore, the defendant's insufficiency claim is without merit.

## III

The defendant next claims that the trial court improperly excluded evidence regarding a prior inconsistent statement allegedly made by a state's witness. Specifically, he claims that it was improper to exclude an unsigned police investigation report that he sought to introduce to impeach the credibility of police detective Sergeant Floyd Morey, Jr. We are unpersuaded.

The following additional facts are necessary for proper resolution of this claim. At trial, the defendant's theory of the case was that Lopes had acted alone when he shot the victim and that the defendant had not been involved in any way in the shooting. The impact of the prior statements of both Lopes and Spencer inculpating the defendant, therefore, had to be minimized by the defendant. The defendant attempted to diminish the impact of those statements by introducing evidence to illustrate that they were given to the police by Lopes and Spencer in exchange for promises of favorable treatment. During the state's case-in-chief, Morey and officers Brian McLean, James Thomas, Edward Bednarz and Eric Smith of the Ansonia police department testified regarding the circumstances surrounding Lopes'

and Spencer's statements. They all testified that no promises, threats or inducements were made when Spencer gave his statement. Morey was specifically asked whether any plea bargain or promise was made to Spencer in exchange for information that would inculpate the defendant. Morey responded in the negative and stated that he was not in a position to make such inducements.

On cross-examination, Morey was asked by defense counsel whether he had offered anything to anybody in connection with this case. The state objected to this question on relevancy grounds, and the trial court sustained the objection. Pursuing this point, defense counsel attempted to introduce an unsigned page from a police investigation report that appeared to contradict Morey's testimony that no inducements were offered to witnesses in exchange for information on this case. The proffered page contained information regarding a police interview with Frederick Moore, a member of the defendant's gang, concerning this case. The report page listed Morey and another detective as the investigating officers. There was an entry on the report page that stated the following: "Info good—valuable. Fred Moore will get info for us, bond reduced to do this." The state objected to the introduction of this report on hearsay grounds, and the trial court sustained the objection.

During presentation of the defense case, Morey was called again to testify. The defendant made numerous attempts to probe into Morey's involvement with Moore on this case. The state objected to each of these questions, and each objection was sustained. Morey testified that he was unsure who had prepared the investigation report or who had typed it. When Moore was called to the stand, he testified consistently with the investigation report, stating that Morey had promised him a reduction in his bond in exchange for information on

this case. The defendant now claims that the trial court improperly excluded the introduction of the investigation report page as a full exhibit for purposes of impeaching Morey's credibility.

The defendant's claim concerns the trial court's evidentiary ruling and will, therefore, " 'be overturned only 2upon a showing of a clear abuse of the court's discretion.' " *State* v. *Bruno*, 236 Conn. 514, 549, 673 A.2d 1117 (1996). "The trial court also has broad discretion in balancing the probative value of proffered evidence against its prejudicial effect. That discretion is subject to reversal only where an abuse of discretion is manifest or where an injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Weber*, 31 Conn. App. 58, 65, 623 A.2d 506, cert. denied, 226 Conn. 908, 625 A.2d 1379 (1993).

"It is fundamental that for the purpose of impeaching the credibility of his testimony, a witness may be cross-examined as to statements made out of court or in other proceedings which contradict those made upon direct examination. *State* v. *Saia*, 172 Conn. 37, 45, 372 A.2d 144 (1976) . . . see also *G & R Tire Distributors, Inc.* v. *Allstate Ins. Co.*, 177 Conn. 58, 60–61, 411 A.2d 31 (1979). . . . Where a party seeks to impeach a witness by using extrinsic evidence, certain standards must be met. The inconsistent statement must be relevant and of such a kind as would affect the witness' credibility, and, generally, a foundation for introducing the statement should be laid at the time of cross-examination of the witness. *State* v. *Saia*, supra, 45–46 . . . . From early times, it has consistently been held that it rests within the judicial discretion of the trial court whether to admit the impeaching statements where no foundation has been laid. . . . The trial court is vested with a liberal discretion as to how the inquiry should be

conducted in any given case." (Citations omitted; internal quotation marks omitted.) *State* v. *Butler*, 207 Conn. 619, 625–26, 543 A.2d 270 (1988).

In this case, the statement sought to be introduced by the defendant was relevant and could have affected Morey's credibility. The crucial element lacking in this case, however, was a proper foundation for the written investigation report. Morey testified that he did not prepare the specific page of the investigation report and was unsure who had typed it. Morey's signature did not appear on the page of the investigation report. We conclude, therefore, that the defendant failed to lay a proper foundation to enable the statement to be admitted because there was no evidence that tended to connect Morey to the statement. The fact that Morey was involved in the investigation and was present during the interview with Moore is insufficient to connect him with the statement. The facts of this case do not present sufficient indicia of reliability that the statement was in fact made or recorded by Morey to justify its admission. In short, the defendant failed to establish that the statement was, in fact, a prior statement made by Morey. We conclude, therefore, that the trial court did not abuse its discretion in refusing to allow the statement to be admitted as a full exhibit for purposes of impeaching Morey's credibility.

Additionally, any potential prejudice that the trial court's ruling may have caused the defendant was obviated by Moore's later testimony. The defendant called Moore as a witness during the presentation of his case, and he testified to the matters for which the defendant sought admission of the prior inconsistent statement. Specifically, Moore testified that it was his understanding that his bond would be reduced by the police in exchange for the information he was providing in this case. The jury heard that testimony, which contradicted Morey's testimony. Therefore, Morey's credibility was

indirectly impeached. As a result, there was no prejudice to the defendant arising from the trial court's exclusion of the police report page.

## IV

The defendant finally claims that the trial court improperly denied his motion to dismiss for failure to comply with the speedy trial provision of the interstate agreement on detainers. We disagree.

The following additional facts are necessary for proper resolution of this claim. Prior to trial in this case, the defendant was incarcerated in the state of North Carolina, apparently for crimes committed in that jurisdiction. He availed himself of the interstate agreement on detainers; General Statutes § 54-186 et seq.;[3] to be brought to Connecticut from North Carolina to face the charges pending against him. Pursuant to § 54-186, the defendant made an offer of temporary custody to the office of the state's attorney. The state's attorney received the offer on February 26, 1996.

On July 12, 1996, the defendant appeared before the trial court accompanied by his counsel, special public defender Avery S. Chapman. At that appearance, the defendant requested a continuance to enable him to retain private counsel. The trial court granted the

[3] Article III (a) of General Statutes § 54-186 provides in relevant part: "Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of the imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint; provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance. . . ."

request for continuance until July 30, 1996. The defendant also requested continuances on July 30 and August 13, 1996, to retain private counsel. The trial court granted both requests, and the case was continued until September 17, 1996. All three of these requests were initiated by the defendant, and on each occasion he agreed that all time delays involved would be charged against himself and not the state for purposes of the speedy trial provision of the interstate agreement on detainers.

On September 17, 1996, Chapman and the assistant state's attorney, Gerard Esposito, appeared before the trial court. Due to an apparent administrative error, the defendant had been transported to Bridgeport instead of Milford. Esposito requested a seven day continuance until September 24, 1996, but Chapman requested that it be extended until October 1, 1996. The state agreed, provided that the time would not be charged against the state for speedy trial purposes. Chapman agreed.

Chapman and Esposito appeared before the trial court on October 1, 1996, but the defendant was not present in court due to another administrative error that was related to the transmission of the mittimus that would have brought him before the trial court. At that time, both parties agreed to a firm trial date of November 5, 1996. Both Chapman and Esposito agreed that this would be within the 180 day speedy trial provision of article III (a) of § 54-186.

On November 5, 1996, Esposito and the defendant appeared before the trial court, but Chapman was not present. Chapman had advised both Esposito and the trial court that he was unavailable because he was trying another matter in Danbury. The trial court advised the defendant that both the court and the state were ready to proceed with the trial. The defendant then made an oral motion to dismiss the case for failure to comply

with the speedy trial provision of § 54-186. The trial court denied this motion in open court. On November 13, 1996, Chapman filed a written motion to dismiss on speedy trial grounds under § 54-186. The trial court issued its memorandum of decision denying the defendant's motion to dismiss on November 20, 1996. On November 21, 1996, jury selection began, and on November 27, 1996, the presentation of evidence commenced in this matter.

At the outset, it is important to summarize the calculus of the number of days that elapsed between the time the defendant made himself available for trial under § 54-186 and when his trial actually commenced, taking into account all continuances and other delays chargeable against the defendant. Both the defendant and the state agree that the defendant's request for disposition of the information in this case was received by the office of the state's attorney and the court on February 26, 1996. This is the beginning of the 180 day period under article III (a) of § 54-186. See *State* v. *Braswell*, 194 Conn. 297, 302–303, 481 A.2d 413 (1984), cert. denied, 469 U.S. 1112, 105 S. Ct. 793, 83 L. Ed. 2d 786 (1985) (180 day period under interstate agreement on detainers is triggered from date request received by prosecuting authority, not date prisoner caused it to be sent). The defendant requested the first of several continuances to obtain private counsel on July 12, 1996. There were 137 days that had elapsed between February 26, 1996, and July 12, 1996.

The defendant then requested two other continuances that resulted in the case being continued until September 17, 1996. This period of time is exempt from the calculation of the 180 day period because the continuances were requested by the defendant, and he agreed on each occasion that the time period would not be charged against the state for purposes of satisfaction of the 180 day period. Thus, at that point, the defendant

had to be brought to trial within forty-three days of September 17, 1996, since 137 days had elapsed previously. This would mean that trial would have to commence on or before October 29, 1996.

On September 17 and October 1, 1996, both the state and the trial court were ready to proceed with trial, but the defendant did not appear in court due to administrative errors that prevented him from being transported to the trial court at Milford. The defendant claims that these delays due to the state's failure to transport him to the trial court at Milford should not be charged against him for purposes of speedy trial determination. We disagree.

Our Supreme Court has held that delays due to administrative oversight do not violate a defendant's right to a speedy trial. See *State* v. *Herring*, 210 Conn. 78, 82–90, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989) (defendant's subjection to six month delay due to clerical inattention insufficient reason to dismiss charges because that was neutral reason not weighing heavily against state); *State* v. *Davis*, 192 Conn. 739, 740–46, 474 A.2d 776 (1984) (defendant's being subject to twenty-six month delay due to shortage of judges not violative of right to speedy trial).[4] If delays of six and twenty-six months caused by administrative oversight have been held not to violate a defendant's speedy trial right, we cannot say that a delay of approximately fourteen days in this case violated the defendant's speedy trial right.

The period from September 17 through October 1, 1996, therefore, cannot be charged against the state

[4] In addition, federal courts of appeals have held similarly. See *Flowers* v. *Warden*, 853 F.2d 131, 132–34 (2d Cir.), cert. denied, 488 U.S. 995, 109 S. Ct. 563, 102 L. Ed. 2d 588 (1988); *United States* v. *McGrath*, 622 F.2d 36, 41 (2d Cir. 1980); *United States* v. *Avalos*, 541 F.2d 1100, 1111–12 (5th Cir. 1976), cert. denied, 430 U.S. 970, 97 S. Ct. 1656, 52 L. Ed. 2d 363 (1977).

and must be excluded from the speedy trial calculus. Accordingly, the defendant had to be brought to trial within forty-three days of October 1, 1996, meaning on or before November 13, 1996. Trial in this matter commenced on November 13, 1996, when the defendant filed his motion to dismiss on the day that both the state and the trial court were ready to proceed with trial. See *United States* v. *Dawn*, 900 F.2d 1132, 1136 (7th Cir.), cert. denied, 498 U.S. 949, 111 S. Ct. 368, 112 L. Ed. 2d 330 (1990) (filing motion to dismiss tolls statutory time period for speedy trial under interstate agreement on detainers). The defendant's right to a speedy trial under § 54-186, article III (a), therefore, was not violated.

As further support for its ruling, the trial court concluded that by agreeing to a firm trial date of November 5, 1996, on October 1, 1996, the defendant waived any right to make a speedy trial claim based on events that had transpired up to that point. The defendant thus waived any claim that the delay caused by the state's failure to transport him properly to the trial court at Milford should not be charged against him. After a review of the law, we agree with the trial court. See, e.g., *United States* v. *Lawson*, 736 F.2d 835, 837–39 (2d Cir. 1984) (waiver of right to speedy trial under interstate agreement on detainers evaluated under nonconstitutional standard and need not be knowing and intelligent, but merely voluntary); *Brown* v. *Wolff*, 706 F.2d 902, 907 (9th Cir. 1983) (defendant may waive right to speedy trial claim if by agreeing to trial date beyond 180 day period); *People* v. *Reid*, 164 Misc. 2d 1032, 1035–36, 627 N.Y.S.2d 234 (1995) (defense counsel's agreement to trial date beyond 180 day period constituted abandonment or waiver of defendant's rights under interstate agreement on detainers).

The judgment is affirmed.

In this opinion the other judges concurred.